# Sansom et al. v. Sanders et al.

(Decided March 18, 1930.)

STRATTON & STEPHENSON and D. H. BLANKENSHIP for appellants.

RUSSELL VANOVER and J. J. MOORE for appellees.

OPINION OF THE COURT BY JUDGE LOGAN—Reversing.

Robert Chapman executed a deed of conveyance to D. B. Sanders, so it is claimed by appellees, on the 16th day of April, 1926, for timber growing on four certain tracts of land described in the deed. About two weeks prior to this date he had been stricken with paralysis and had been very ill since the stroke. It was on the night of the 16th that he was dying. Some of his children and other relatives were present. Early in the evening the appellee, Sanders, went to the home of N. A. George, a notary public, who resided about a mile from the home of Chapman, and requested him to come to the Chapman home for the purpose of preparing a deed to be executed by Chapman. An effort had been made to get in touch with George before Sanders went after him. He went to the home of Chapman and when he arrived and saw the condition of the old man, then more than 80 years of age, he did not believe that he was in a condition physically, or mentally, to execute a deed, and he so stated to Sanders. Sanders replied to him that if he was of

the opinion that Chapman was not capable of executing the deed that he should not prepare it. George made further investigation by asking Chapman if he desired to execute the deed to Sanders, and, in a low almost inaudible voice, he was advised that he did so desire by simply answering the question in the affirmative. Sanders went to another house in close proximity to the home of Chapman where he prepared the deed, the information as to its contents being furnished by others. He took the deed to Chapman who signed it by making his mark. His acknowledgment was then taken by George. Sanders drew a check payable to Mrs. Chapman, the wife of Robert Chapman, for $2,000, which, at the time of the trial below, had never been cashed. He executed three notes for $1,000 each. One payable to M. C. Chapman, one payable to Frances Triplett and one to May Robinson. They were three of Chapman's children. He had other children. The deed was signed and acknowledged, according to the testimony of some of the witnesses, between 10:30 and 11 p. m., while other witnesses thought it was signed earlier in the evening. Chapman died about 2 o'clock that night.

Sanders undertook to sell the timber to some one, but a question was raised as to the title which caused him to institute a suit against the heirs of Robert Chapman who had not participated in the transactions at the time of the execution of the deed, praying that his title be quieted. The appellants answered attacking the validity of the deed, claiming that it had been obtained by fraud, and that Robert Chapman was not mentally capacitated to execute the deed at the time it was claimed that it had been executed. They also filed a separate suit seeking a cancellation of the deed on substantially the same grounds. The two suits were consolidated, and, upon final hearing, the chancellor upheld the deed and granted the relief asked for by appellees.

It is well to say that there is nothing in this record which impungs the motives of Sanders. His conduct and actions indicate his good faith, and it is necessary to briefly recite the facts and circumstances showing the reason for his conduct. He had been authorized to sell the timber, or at least to aid in the sale of it, by a writing executed to him long prior to the last illness of Chapman. He established by the evidence, that Robert Chapman came to him about a week before the beginning of

his last illness and that they agreed upon the terms of sale, and that he agreed to purchase the timber described in the deed and to pay therefor the sum of $5,000. Knowing that the trade had been made at a time when Chapman was mentally competent to enter into such a transaction, he felt that the deed should be executed before the death of Chapman, and this was probably the actuating motive which led all of the appellees to become active when they discovered that Robert Chapman was fast approaching his hour of dissolution. It is the theory of the appellees that the trade had been made at a time when Chapman was competent, and that the mere execution of the deed evidencing the previous agreement was not a new act done by him at the time the deed was executed, but was the confirmation, in a legal way, of what had already been agreed upon.

It has long been the rule in this state that mental capacity to execute a deed requires the act of execution to be free and voluntary, accompanied by an understanding on the part of the grantor of the consequences of his act. Gillock v. Williams, 199 Ky. 169, 250 S. W. 836. In stating the rule negatively, it has been announced that to constitute mental incapacity invalidating his deed, the grantor must have been incapable of comprehending the subject of the contract and the nature and probable consequences of his act. Williams v. Reese, 177 Ky. 679, 198 S. W. 27. It is true that the competency of the understanding is all that should be considered as a person may be competent to make a will although he is sick, in extreme distress, or in a greatly weakened condition, provided his mental faculties are sufficiently sound to enable him to know the nature of his act and its consequences. Chrisman v. Quick, 174 Ky. 845, 193 S. W. 13.

The evidence in this case is conflicting to some extent, but the major facts are undisputed. That Robert Chapman was in a dying condition at the time he signed and acknowledged the deed is admitted by all; that he died at an hour in the early morning during the same night is testified to by all the witnesses; that he had been desperately ill for ten days or more was not controverted; that he was in extreme old age, that is four score years, is undisputed. He was surrounded by his children, relatives and friends while the shadows of the night gathered in his room, and while the more sable shadows of death crept about him. He said nothing that has been recorded during that night other than to

answer "Yes" when he was asked if he desired to execute a deed to Sanders for the timber. He gave the notary who prepared the deed no instructions of any kind. He had agreed to sell his timber on Poplar creek, and it was necessary for some one to advise the notary the timber which should be included, but such advice was not given by Robert Chapman. When the deed was presented to him he held the pen while the notary made his mark for him, and it is said by the witnesses that he held up his hand to be sworn. Under such circumstances, it is extremely hard to believe that Robert Chapman fully understood the nature of the act and its probable consequences. It is not hard to believe, however, that if he had agreed to sell his timber before he was overtaken by illness, he may have had sufficient mind to understand the nature of his act and its consequences, when he said that he desired to execute the deed. Taking the evidence in the most favorable light, no more can be gathered from it than the fact that Robert Chapman desired to execute a deed to Sanders, in accordance with an agreement previously reached between him and Sanders. If such a deed had been executed, the court might be hesitant about upholding its validity, but such was not the case. No one has intimated, in his evidence, that Robert Chapman agreed to sell the land to Sanders upon any consideration other than the $5,000 payable to him. Such agreement was not carried into the provisions of the deed. It is altogether a different thing to prove that Robert Chapman agreed to sell his timber for $5,000 payable to him, and to prove that Robert Chapman agreed to sell his timber, and further agreed that the proceeds should be distributed among certain of his relatives, and that none of the purchase money should be received by him.

No one can read this record without reaching the conclusion that some of those who were present, on the night of the death of Robert Chapman, agreed upon the distribution of the proceeds of the timber sale. Robert Chapman did not agree that the money should be paid to some one other than himself. Sanders certainly did not testify that the money was to be paid to anyone other than Robert Chapman. His testimony is direct and certain, and to the effect that he agreed to pay Robert Chapman $5,000 for the timber. Noah Chapman, a son of Robert Chapman, was present when the trade was made

between his father and Sanders, and he testified that his father sold the timber to Sanders for $5,000. There is a vague reference in the testimony of the widow of Robert Chapman to some desire on his part that the children, to whom the notes were made payable, should receive something for their having cared for him and his wife, but there is nothing definite in her statement.

There is evidence to indicate that certain timber growing on lands claimed by Noah Chapman was excepted from the operation of the deed, although probably within the boundary. Noah was present at the time looking after his interest, but Robert Chapman had nothing to do with any exceptions of timber from the boundaries which he had agreed to sell to Sanders. Robert Chapman certainly had nothing to do with the execution of the three notes, and he gave no authority for such a settlement of the consideration for the land. He did not agree that the widow should have $2,000, although she may have been justly entitled to it as she owned a part of the timber which was sold.

No doubt is left on the mind that Robert Chapman, if he was competent to know the nature of his act and its consequences at the time he signed and acknowledged the deed, thought that he was executing a deed pursuant to the agreement between him and Sanders. He was executing no such deed. No one explained to him the difference. It might be argued that it made no difference to him, but the difference is discernible at a glance. If the deed had been made in accordance with the agreement with Sanders, the $5,000 would have descended to those by law entitled to it, but the deed executed nullified the statutes of descent and distribution, and made distribution among a part only of his heirs of the entire proceeds of the sale.

The deed relied on by Sanders was not the act of Robert Chapman. Therefore, he is not entitled to hold the timber thereunder. The chancellor should cancel the deed.

Judgment reversed, and cause remanded for proceedings consistent with this opinion.